# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Ernest Carter,

        Plaintiff,

    v.

Jan Rysh, Darin Haugland, Dr. Craane,
Katie Rueckert, Timothy Hiesterman, and
Minnesota Department of Corrections,

        Defendants.

Case No. 17-cv-1061 (DWF/ECW)

**REPORT AND RECOMMENDATION**

---

This case is before the Court on a Motion for Summary Judgment (Dkt. No. 98)

("Motion") brought by Defendants Jan Rysh ("Rysh"),[1] Darin Haugland ("Haugland"),

and Dr. Stephen Craane ("Dr. Craane") (collectively, the "Medical Defendants").[2] The

case has been referred to the undersigned United States Magistrate Judge for a report and

recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. Plaintiff Ernest

Carter ("Carter") is an inmate of the Minnesota Department of Corrections ("DOC") who

brings this Section 1983 civil rights action against DOC personnel and medical providers

for issues related to a fractured femur. (Dkt. No. 81.) Defendants Rysh (physical

therapist), Haugland (physical therapist), and Dr. Craane seek summary judgment on the

---

[1]    Rysh is actually spelled Rygh (*see* Dkt. No. 92 at 1), but the Court will use the spelling in the caption for this Report and Recommendation.

[2]    These three individuals are referenced as "Medical Defendants" because all are employed by Centurion, a medical contractor for the Minnesota Department of Corrections.

ground that they did not exhibit deliberate indifference towards Carter's medical needs. Carter responded to the motion (Dkt. No. 114) and the Medical Defendants replied (Dkt. No. 120). For the reasons stated below, the Court recommends the Motion be granted.

## I.    BACKGROUND

### A.    Procedural Background

In his original Complaint filed on April 5, 2017, Carter alleges that on June 21, 2016, around 5:30 p.m., he fractured his femur during an incident at the Minnesota Correctional Facility ("MCF")-St. Cloud. (Dkt. No. 1 at 7.) Carter alleges that he tripped, hit his head on a railing, and immediately experienced excruciating pain in his right leg. (*Id.* at 7-8.) Carter further alleges that he waited for an ambulance for over an hour, which ultimately took him to St. Cloud Hospital. (*Id.* at 8.) At the hospital, Carter underwent surgery and spent a few days recovering. (*Id.*) Thereafter, he was transferred to MCF-Oak Park for initial recovery and physical therapy ("PT"). (*Id.*) Carter was discharged from MCF-Oak Park to Rush City, where he alleges he underwent a great deal of pain and suffering. (*Id.*) Throughout the Complaint, he alleges he did not receive timely or adequate treatment or therapy to manage his pain. (*Id.* at 7-9.) He alleges that he will suffer ongoing consequences and he seeks damages for the same. (*Id.* at 9.) The three-page document does not associate facts with named defendants. (*See generally id.*) Carter appended fourteen pages of medical records to the Complaint. (Dkt. No. 1-1.)

The Court directed Carter to correct or supplement information for his *in forma pauperis* ("IFP") application. (Dkt. No. 3.) The Court also provided Carter with an opportunity to amend his Complaint to "allege[] how any particular defendant has acted

2

in a way that is deliberately indifferent to his medical needs." (*Id.* at 3.) This opportunity to amend was intended to close the gap between the three-page handwritten document and the individuals named on the Court's fill-in-the-blank Section 1983 form Carter submitted with his complaint (*See id.*; Dkt. No. 1 at 1-6). Carter complied on May 30, 2017 by filing an Amended Complaint. (Dkt. No. 7.)

In his Amended Complaint, Carter indicated that Rysh was a physical therapist who gave him an assistive range of motion machine and leg exercises to perform on his own. (Dkt. No. 7 at 5.) Carter alleges that he told Rysh he needed assistance but was ignored by her. (*Id.*) Similarly, Carter claimed that physical therapist Haugland ignored his pleas for assistance with therapy or outside therapy—instead telling him he needed to progress on his own. (*Id.*) As to Dr. Craane, Carter alleges that Dr. Craane took him off pain medication. (*Id.* at 5.) He also mentions that physician assistant Brian Lee ("PA Lee") gave him a prescription, but it was ripped up upon return to MCF-Oak Park. (*Id.* at 5-6.) Carter alleges that he was in constant pain, but only received Ibuprofen after the prescription was torn up. (*Id.* at 6.) He mentions that Defendants Katie Rueckert ("Rueckert") and Dr. Timothy Hiesterman ("Dr. Hiesterman") were on duty at St. Cloud the day he was injured. (*Id.*) On the night of his injury, he alleges he was rendered unconscious for as many as nine minutes, and then lay on the floor in extreme pain for 45 minutes to an hour before medical transport occurred. (*Id.*) He alleges that either the on-duty personnel or others reflected in records are the people responsible for the care he received. (*Id.*)

3

On August 9, 2018, U.S. District Judge Donovan W. Frank adopted a Report and Recommendation ("R&R") that recommended granting the DOC's Motion to Dismiss and dismissed any official capacity claim against Rueckert. (Dkt. No. 72.) The Court separately granted Carter leave to file a second amended complaint wherein he could specify any personal capacity claims against Defendants. (Dkt. No. 73.)

Carter filed a Second Amended Complaint on August 31, 2018 (Dkt. No. 78).[3] In the Second Amended Complaint, Carter asks to remove his request for monetary damages, seeking instead to have weekly PT by external healthcare providers. (*Id.* at 2.) He also asks for general external medical care until release. (*Id.*) As to personal capacity claims—he claims that he will "leave that up to the court" but he also states that "I [sic] would be fair by suing Katie Rueckert all the defendants for personal & for the record official-capacity." (*Id.* at 2-3.) He also adds that he filed a damage or "kite" claim at MCF-Oak Park in 2016 but got no response back. (*Id.* at 4.) The general tenor of the Second Amended Complaint is that Carter would like costs covered for outside medical care. In view of the case's posture and Carter's pro se status, the Court decided to consider the Amended Complaint and Second Amended Complaint together as the operative pleading and directed the Clerk's Office to create and docket a Third Amended

---

[3]    Rather than filing a standalone Second Amended Complaint, the language of this document is more typical of requests to amend than actual allegations. In view of Carter's pro se status, the Court construed the document liberally and read allegations phrased as requests to be affirmative allegations. (Dkt. No. 80 at 2-3.)

Complaint by combining the two.[4]  (Dkt. No. 80 at 3-4.)  The Third Amended Complaint was docketed on September 10, 2018.[5]  (Dkt. No. 81.)

On October 3, 2018, the Medical Defendants moved for summary judgment.  (Dkt. No. 98, 99.)  After a thorough recitation of the facts, the Medical Defendants contend that Carter has not met the subjective component of deliberate indifference because there is no evidence in the medical records of deliberate indifference to his medical needs.  (Dkt. No. 99 at 13.)  The Medical Defendants indicate that Carter received ongoing care for his injury, even if it was not the type he desired.  (*Id.* at 13-14.)  They contend that Carter has not established a claim for deliberate indifference to his femur fracture because his disagreement with treatment does not equate to deliberate indifference.  (*Id.* at 14-15.)  In support of their motion for summary judgment, the Medical Defendants supplied medical records and other materials regarding Carter's condition.  (Dkt. No. 102.)

## B.    Medical History

The medical records catalogue Carter's treatment and progress following his June 21, 2016 injury.  (Dkt. No. 102.)  The records provide varied explanations for the exact source of his injury—at one time he reported running, tripping on another inmate's laundry and hitting his leg on a rail (*id.* at 46); another time he reported running, tripping on an unknown object, and hitting his head on a railing (*id.* at 149-51).  Following the

---

[4]    The Court determined the original Complaint was a nullity because it was not signed and because it failed to allege how any particular defendant acted in a way that was deliberately indifferent to Carter's medical needs.  (Dkt. No. 3 at 1, 3.)

[5]    The case was re-assigned from U.S. Magistrate Judge Hildy Bowbeer to the undersigned shortly after the Third Amended Complaint was docketed.  (Dkt. No. 86.)

injury, he was transported to St. Cloud Hospital where he underwent surgery to repair his fractured femur.  (*Id.* at 89, 149-51.)

Upon intake to the hospital, the medical records indicate that an x-ray showed Carter had a femur fracture.  (*Id.* at 149-51.)  Treatment options were discussed.  (*Id.*)  According to notes from June 23, 2016, Carter underwent a successful surgery.  (*Id.* at 156-57.)  Carter was directed to be non-weightbearing for six weeks and to follow-up in two weeks for imaging.  (*Id.*)  Carter was discharged to the DOC on June 24, 2016.  (*Id.* at 171-73.)

On June 24, 2016, Carter was transferred to MCF-Oak Park Heights to continue recovering from surgery.  (*Id.* at 51.)  Over the following days, he reported some discomfort and the charts note he was given pain medication.  (*Id.* at 49-51.)  As early as July 5, 2016, Carter reported that he wanted to return to activity as quickly as possible and that he decided to discontinue one of his pain medications because he believed it was causing constipation.  (*Id.* at 49.)  On July 11, 2016, he refused medications for constipation.  (*Id.*)

From June 24 to September 6, 2016, Carter was seen 13 times by Dr. Craane at MCF-Oak Park.  (Dkt. No. 102 at 47-51.)  On July 21, 2016, Carter's pain medication was swapped for another at his own request.  (*Id.* at 49.)  By July 27, Carter reported improved range of motion and no negative complications.  (*Id.*)  On August 10, Carter agreed to begin weaning off pain medications during an appointment with Dr. Craane. (*Id.* at 48.)  However, he subsequently sought more pain medications from an external care provider at a follow-up appointment on August 19, 2016—PA Lee authored a

prescription for 40 pills. (*Id.*) Dr. Craane noted that upon seeing PA Lee's prescription he contacted PA Lee, discussed that Carter had already ingested many pain pills, and the two agreed to shred PA Lee's prescription. (*Id.*) PA Lee's notes corroborate that he discussed pain management with Carter, and with Dr. Craane, and concluded that further medication would be inappropriate based upon the amount of medication already administered by Dr. Craane. (Dkt. No. 102 at 137-38.)

On August 22, 2016, Dr. Craane switched the over-the-counter medications from Tylenol and naproxen to Tylenol and Lodine to improve pain management for Carter. (*Id.* at 47.) On August 30, Dr. Craane did not record any new pain management complaints. (*Id.*) On September 2, 2016, Dr. Craane approved Carter for discharge from MCF-Oak Park with the recommendation that he continue PT and attend a follow-up appointment with his surgeon, Dr. Hiesterman. (*Id.* at 46.) Upon discharge, Dr. Craane noted that Carter ingested a total of 290 narcotic pain pills. (*Id.*)

## C.    Nursing Notes

Detailed nursing notes fill the gaps that Dr. Craane's notes do not address. On June 26 and 27, 2016, the nursing notes reflect that Carter appeared to be in pain, so he was given more medication and was put on Dr. Craane's list for follow-up care. (*Id.* at 84.) During the last few days of June into early July, Carter complained of constipation, was educated on the role of each medication, and was offered medications for his bowel symptoms. (*Id.* at 82-84.) From July 1 to 10, 2016, the notes reflect that Carter resisted some medications and demanded others; the care provider notes indicate that staff had thorough conversations with Carter about the purpose of various medications, his options

7

on how to use them for best results, and the potential risks of preferences he expressed. (*Id.* at 75-83.) Subsequently, Carter began to negotiate with staff about the type and frequency of medications. (*Id.* at 72-74.) From July 11-21, 2016, Carter typically received pain medication when requested, although staff did not always comply with his request to switch medication from oxycodone and Tylenol to Percocet. (*Id.* at 70-74.) During that timeframe, Carter was frequently noted to be socializing in the unit with no apparent distress. (*Id.*)

On July 23, 2016, Carter reported no medical concerns and was observed to be moving about the facility independently in a wheelchair. (*Id.* at 68.) On July 24, the morning notes indicate he was lying in bed and reporting 6/10 pain, but by the evening he was asking staff if he could use the exercise bike unsupervised. (*Id.*) Staff advised that he wait until PT clears him for such an activity. (*Id.*) From late July to mid-August, Carter participated in some PT and received pain medication upon request. (*Id.* at 64-66.) For the duration of August, whenever Carter noted pain, he received attention from nursing staff and medications. (*Id.*) He was often noted to be about socializing with no apparent signs of distress. (*Id.* at 63-64.) September was much the same, although Carter noted the advent of chest pain, which was responded to by nursing staff. (*Id.*) During the first week of September, Carter was transferred from MCF-Oak Park to MCF Rush City. (*Id.* at 61-62.)

Carter was seen for follow-up appointments by the orthopedic surgery office on multiple occasions. On July 8, 2016, Dr. Hiesterman directed that he should be non-weight bearing, should be introduced to range-of-motion PT, and may continue pain

medication. (*Id.* at 148.) On August 19, 2016, Carter was directed to return in approximately four weeks for a follow-up with x-rays. (*Id.* at 147.) At the August 19, 2016 appointment, Carter got the prescription for 40 additional pain pills that PA Lee and Dr. Craane ultimately agreed to shred. (*Id.* at 48.) On September 28, 2016, x-rays and a physical examination revealed "excellent bone growth" and intact hardware with no signs of loosening or failure. (*Id.* at 137-39.) Carter requested ongoing pain medication at the orthopedic consultation, but the consult notes indicate that after conferring with the correctional facility, the orthopedic office decided that more prescriptions were inappropriate. (*Id.*) Carter was directed to use ice, over-the-counter medications, and PT to improve his situation. (*Id.*) Notes from December 22, 2016, indicate that the x-rays were stable and there were zero complications for the healed right femur fracture. (*Id.* at 134.) Dr. Hiesterman recommended zero medications, and weekly PT for six-weeks to address range of motion and strengthening. (*Id.*)

**D.    Physical Therapy Notes**

The PT notes from MCF-Oak Park also reflect a positive progression while at the facility. In early July 2016, Carter was advised to remain non-weightbearing, to rest with his leg in an appropriate pillow-elevated position and to begin minimal exercises. (*Id.* at 102.) On July 14 and 21, Rysh cleared him to begin upper body exercises and ordered a machine to help develop range of motion. (*Id.* at 101.) Carter reported that his pain was manageable but did increase some with certain exercises, he was advised to stay compliant with limited activities and to be patient for healing. (*Id.*) On July 25, 26, and 28, at appointments with Rysh, Carter began using a machine to help develop range of

9

motion in his cell.  (*Id.* at 100.)  Rysh noted that at rest, pain was very manageable, but at the end ranges of flexion, Carter reported soreness.  (*Id.*)  He was directed to use the machine as tolerated to improve this issue and he reported liking the machine.  (*Id.*)  On one occasion he stated, "I feel great.  I've been up and walking."  (*Id.*)  He was reminded that he was not yet cleared to be weight-bearing, and that he should stick to approved exercises.  (*Id.*)

From late July to early August 2016, notes from Rysh and Haugland indicate that Carter was doing well and making progress on his range of motion.  (*Id.* at 99.)  However, both therapists had to remind him regularly that he could not begin weight-bearing until cleared by a doctor.  (*Id.* at 98-99.)  On August 4, Haugland noted that Carter was in good spirits and pain was not an issue.  (*Id.* at 99.)  On August 16 and 18, the PTs had to remind Carter that he could not yet bear weight because Carter had been seen doing so around the facility.  (*Id.* at 98.)  On both occasions he was noted as eager to improve, and on August 16, he reported having no pain issues.  (*Id.*)  Finally, on August 23, 2016, after a follow-up appointment with the orthopedic doctor, Haugland informed him that he could begin weightbearing and was impressed by his quad strength.  (*Id.*)

On August 25, 2016, Rysh noted that Carter was cleared to do activities with a walker and as part of a home exercise program, but that Carter was hesitant about it.  (*Id.* at 97.)  Carter told her he was not doing many of his home exercises despite them being written down and posted in his cell.  (*Id.*)  Rysh had him move about the facility with her.  (*Id.*)  Carter reported some pain, but with verbal cuing he was able to demonstrate improved range of motion.  (*Id.*)  Rysh noted that Carter was eager to improve but had

difficulty following through with recommendations. (*Id.*) She concluded that an integral part of his treatment would be home exercises to improve strength. (*Id.*)

On August 30 and September 2, 2016, Haugland noted that Carter was doing well and was moving on his own with a walker or a cane. (*Id.*) Carter noted some soreness and a mild limp, but he was also reported to be working hard and was anxious to return to his home institution. (*Id.*) Carter did not report pain in his knee or at the femur fracture site. (*Id.*) Haugland cleared Carter to return to his home institution with recommendations for a cane and bottom bunk, as well as continued therapy. (*Id.*)

PT notes pick up on September 29, 2016, at MCF-Rush City with therapist Luke DeHaan ("DeHaan"). (*Id.* at 96.) DeHaan noted that Carter requested 100 hours of PT per week. (*Id.*) DeHaan reviewed Carter's current condition and advised that Carter's most important step was to do assigned exercises frequently to gain needed muscle strength. (*Id.*) Notes from October 6, 2016, indicate that Carter needed continued encouragement to continue compliance with the assigned home exercise program. (*Id.*)

On October 18, 2016, Carter was seen at Rush City by Haugland, who also saw him at MCF-Oak Park. (*Id.* at 95.) Carter complained of drastically increased pain and symptoms that Haugland classified as inconsistent with reporting at MCF-Oak Park or with the September 2016 orthopedic consult (*Id.*). Haugland indicated

> The patient is complaining of many symptoms including foot numbness, anterior knee pain, and hypersensitivity to touch, many things that he did not complain about at Oak Park Heights. In fact, the patient is complaining of a lot more symptoms and claiming he is doing worse now than he was doing at Oak Park. When I confronted him on this, he said he misled me at Oak Park as he wanted to leave Oak Park. He claims to be doing exercises to work on his quad strain, but he is not getting better. . . . [I]t is my medical

opinion that the patient is having pain due to quadriceps weakness and patellofemoral pain. Orthopedic note from a couple of weeks ago essentially supports this view point. . . . If the patient is compliant with the exercises, there is no reason why the patient should not have made strength gains. His lack of improvement in strength would suggest either noncompliance or secondary gains. I had a frank discussion with this individual. He has been repeatedly educated on proper strengthening. He is in a good environment for healing, and if he is compliant, there is no reason why he would not get better. There is no evidence either from my exam or from orthopedic exam that the hardware is causing any of the pain. His fracture is healing well for a slight build male.

(*Id.* at 95.)  Given Carter's expressed discontent, Haugland recommended that he follow-up with fellow physical therapist, DeHaan.  (*Id.*)  DeHaan saw Carter on October 26, 2016, and noted that there were great discrepancies in the level of physical capability that Carter exhibited throughout the appointment.  (*Id.* at 94.)  DeHaan strongly encouraged Carter to continue home strengthening and advised him it would be the surest way to make progress.  (*Id.*)  At a follow-up on November 8, 2016, DeHaan noted that Carter appeared to be improving and complying with home exercise.  (*Id.*)

In early December 2016, Carter apparently refused to attend PT.  (*Id.* at 94.) DeHaan's December 15 notes indicate that Carter said his leg was permanently injured and thus he would be disabled for years to come.  (*Id.* at 93.)  DeHaan noted difficulty assessing Carter's progress but noted that he would continue to occasionally follow-up. (*Id.*)  On January 10, 2017, DeHaan saw Carter as part of six authorized additional PT appointments.  DeHaan noted that a visit to the orthopedic surgeon indicated that there were no further medical complications and that the femur was healed.  (*Id.*) Nevertheless, PT was going to continue per Carter's request.  At therapy on January 10, 2017, Carter refused to let DeHaan perform many routine assessments to establish his

baseline. (*Id.*) DeHaan indicated that he would keep following up, but if Carter refused to participate in therapy and assessments, he cannot be helped. (*Id.*) Carter told DeHaan he wanted five hours of PT a day. (*Id.*) By October 9, 2017, DeHaan noted that Carter told him he wanted to "wash [his] hands of physical therapy" and that "this is not just a physical problem but it is a mental thing too. . . Patient then reports it is also related to spiritual thing and that only God can tell him when to walk again." (*Id.* at 91.)

E.    **The Parties' Briefing**

Carter's response to summary judgment consists of a single paragraph insisting that the Medical Defendants did not take appropriate steps in response to his condition, as well as four pages of line-by-line assessment of the information in the medical records tendered by the Medical Defendants. (Dkt. No. 114 at 1-5.) Carter makes much of the fact that he was allowed to have a cane when the medical records also suggest he was completely healed. (*Id.* at 2-3.) He also contends that there are inconsistent stories in the medical records about exactly how his injury occurred or what type of follow-up care he received. (*Id.*) Carter also filed an "exhibit" to his response, which is a three-page document insisting that he has met his burden of proof by pointing to inconsistencies between the medical records and the summary judgment motion. (Dkt. No. 115.)

Defendants Rysh, Haugland, and Dr. Craane filed a brief reply. (Dkt. No. 120.) In essence, they argue that Carter has not highlighted any genuine issues of material fact. (*Id.*)

On September 28, 2018, Carter filed a "motion to compel, motion to dismiss state remedies due to § 1983." (Dkt. No. 96.) The four-page document is difficult to decipher.

On the first page, Carter states that he flatly objects to Dr. Craane and Haugland's answer to his third amended complaint. (*Id.* at 1). The second and fourth pages are signature pages. (*Id.* at 2, 4.) The third page appears to be a request that either the DOC or the Court pay for an outside medical expert to evaluate the facts pursuant to Minn. Stat. § 145.682. (*Id.* at 2-3.) The third page also requests that the Court grant Carter an order permitting him to keep medication on his person since he has to walk a distance to get his medication. (*Id.*) Carter's response to the defendants' Answers cannot be considered a proper motion because it does not "state the relief sought," *see* Fed. R. Civ. P. 7(b)(1)(C), nor does it comply with the District of Minnesota Local Rules' requirements for motions, *see* D. Minn. LR 7.1. Carter's request for an expert and the request regarding his medication will be addressed at the end of the legal analysis below.

On December 4, 2018, Carter filed a document entitled "Responded About Defendant Hearing Dates & Request Plaintiff Win Case Due To Not Responding To Court Order Due Date of 11-14-18." (Dkt. No. 126.) It is unclear exactly what Carter's grounds are in the document, but it appears he contends he did not receive the Medical Defendants' Reply, which was due on November 14, 2018. (*See id.*) However, the Medical Defendants filed a certificate of service (Dkt. No. 124) certifying that the Reply was served on Carter by first class mail sent on November 13, 2018. Regardless, given Carter's pro se status, the Court will construe the document as part of Carter's response to summary judgment and recommends it be dismissed without prejudice. *See Estelle v.*

14

*Gamble*, 429 U.S. 97, 106 (1976) ("The handwritten pro se document is to be liberally construed.").[6]

On March 29, 2019, Dr. Timothy Hiesterman moved for summary judgment. (Dkt. No. 131.)  Dr. Heisterman's motion will be dealt with by a separate report and recommendation after briefing is completed.  (*See* Dkt. No. 139.)

## II.    <u>LEGAL STANDARD</u>

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The moving party has the initial responsibility of demonstrating that there is no genuine issue of material fact to be decided.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In its review of the facts, the Court must consider the evidence in the light most favorable to the party opposing summary judgment.  *See Kneibert v. Thomson Newspapers, Michigan, Inc.*, 129 F.3d 444, 451 (8th Cir. 1997).  When a motion for summary judgment has been made and supported by the pleadings and affidavits as provided in Rule 56(c), the burden shifts to the party opposing the motion to proffer evidence demonstrating that a trial is required because a disputed issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  In satisfying this burden, however, the non-moving party must do more than simply establish doubt as to the material facts.  The party opposing summary judgment may not

---

[6]    Carter also filed a Motion to Appoint Counsel (Dkt. No. 128) after briefing was completed on the Motion for Summary Judgment.  The Court will address Carter's motion to appoint counsel in an order filed in conjunction with this R&R.

"rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 586, n.11; *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995), Fed. R. Civ. P. 56(e). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

In order to state a cognizable Eighth Amendment claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Davis v. Hall*, 992 F.2d 151, 152 (8th Cir. 1993). In the context of a claim of inadequate medical care, the prisoner must demonstrate more than medical negligence. *Givens v. Jones*, 900 F.2d 1229, 1232 (8th Cir. 1990). The "deliberate indifference to a serious medical need must rise to the level of an unnecessary and wanton infliction of pain." *Jorden v. Farrier*, 788 F.2d 1347, 1348 (8th Cir. 1986). A serious medical need is a need that has been diagnosed as requiring treatment or is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995). Failure to treat a medical condition is not punishment under the Eighth Amendment unless prison officials knew that the condition created excessive risk to the prisoner's health and then failed to act on that knowledge. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996)). Prison officials may exhibit deliberate indifference by intentionally denying or delaying access to medical care, *Dulany*, 132 F.3d at 1239, but mere negligence is insufficient to rise to a

constitutional violation, *id.* (citing *Estelle*, 429 U.S. at 107-08). To survive summary judgment, a plaintiff must present prima facie evidence to demonstrate: (1) that he had objectively serious medical needs, and (2) that the defendant actually knew of, but deliberately disregarded, those needs. *Dulany*, 132 F.3d at 1239 (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)).

A delay in treatment or a denial of medication can constitute deliberate indifference under some circumstances. However, if a course of treatment is changed or altered based on "medical judgment" or because of an inmate's uncooperative behavior, then deliberate indifference does not exist. *See Jenkins v. Cty. of Hennepin, Minn.*, 557 F.3d 628, 632 (8th Cir. 2009) (nurse's decision to briefly postpone an X-ray reflects a medical judgment did not give rise to deliberate indifference claim) (affirming summary judgment); *Logan v. Clarke*, 119 F.3d 647, 650 (8th Cir. 1997) (finding doctors not deliberately indifferent where prisoner was unable to or refused to follow instructions) (affirming summary judgment). The fact that an inmate disagrees with the prescription of one medication or another to treat a medical condition does not make the administration of the prescription or lack thereof deliberate indifference. *See Phillips v. Jasper Cty. Jail*, 437 F.3d 791, 795 (8th Cir. 2006) (affirming summary judgment that prison doctor was not deliberately indifferent for selecting one seizure medication or dosage over another despite inmate's opposing views). An inmate's mere disagreement with a course of treatment does not constitute deliberate indifference. *Allard v. Baldwin*, 779 F.3d 768, 772-72 (8th Cir. 2015). "A plaintiff can show deliberate indifference in the level of care provided in different ways, including showing grossly incompetent care, showing a

17

defendant's decision to take an easier and less efficacious course of treatment, or showing a defendant intentionally delayed or denied access to medical care." *Id.* at 772 (internal citations omitted).

### III.    ANALYSIS

Carter's allegations regarding Dr. Craane, and physical therapists Rysh and Haugland do not establish genuine disputes of material fact indicating deliberate indifference by these individuals.  Carter's fractured femur constitutes a serious medical condition, but Carter has not established that he did not receive appropriate care from any defendant in response to his serious condition.  Carter did not provide any independent evidence to support his position, so he has not contributed towards his evidentiary burden at summary judgment, but the Court will examine the available evidence in the light most favorable to Carter.

### A.    The Court Recommends that Dr. Craane be Granted Summary Judgment

First, as to Dr. Craane, Carter's sole allegation is that Craane interfered with his access to additional prescription pain medication as prescribed by PA Lee at an orthopedic consultation outside of the prison.  Dr. Craane started weaning Carter off pain medications on August 10, 2016, more than a month after his surgery, and Dr. Craane's notes indicate Carter agreed with this decision.  (Dkt. No. 102 at 48.)  By the time Carter left MCF-Oak Park, he had consumed 290 narcotic pills (between the Norco, oxycodone, and Percocet).  (*Id.* at 46.)  Dr. Craane's interaction with PA Lee that resulted in a prescription being shredded on August 19, 2016, does not constitute deliberate indifference.  The interaction post-dates Carter and Dr. Craane's August 10 agreement to

wean him off narcotics. (*See id.* at 48-49.) During the weaning process, Dr. Craane actively monitored Carter's pain level and substituted one over-the-counter medication for another to assist in pain management. (*Id.* at 47-48.) Dr. Craane's actions do not constitute deliberate indifference because there is no evidence suggesting that Dr. Craane willfully or intentionally discontinued narcotics to cause pain. *See Phillips*, 437 F.3d at 795. Quite the opposite, after Carter had consumed nearly 300 narcotic pills, Dr. Craane worked to switch him to over-the-counter medications that adequately managed the pain. Carter did not complain of excessive pain on August 30 or September 2, 2016. (Dkt. No. 102 at 46-47.) By the second week of September, Carter had been transferred to MCF-Rush City and had left Dr. Craane's care.

The nursing and PT notes corroborate the notion that Dr. Craane did not intentionally inflict pain or suffering because the notes show that Carter's pain was decreasing by the time the narcotics were discontinued. By late July and through August 2016, Carter was often observed moving about the facility and socializing with no apparent distress. (Dkt. No. 102 at 63-68.) He was told numerous times to wait to begin bearing weight until he was cleared to do so. (*Id.* at 97-99.) The medical notes reflect that care providers explained to him why it was important to taper off strong medications, and that at times he agreed with that reasoning. (*Id.* at 48, 70-83.) No notes or evidence indicates that he was left to suffer with no help. Carter may have experienced increased pain from weight-bearing without medical permission, but the care providers were not required to provide narcotics to accommodate Carter's lack of cooperation with his providers' instructions to refrain from weight-bearing. *See Logan*, 119 F.3d at 650. PA

19

Lee's notes indicate that he agreed with Dr. Craane that it was appropriate to stop narcotic medications by mid-August 2016 and noted that Carter had not ever made PA Lee or the orthopedic office aware that he was receiving opioid analgesics from the MCF-Oak Park. (Dkt. No. 102 at 137-38.)

Although Carter may disagree with Dr. Craane's decision to transition him from prescription opioids to over-the-counter painkillers, he has not identified any evidence suggesting Dr. Craane did so to intentionally inflict pain on Carter, or that Dr. Craane's decision to do so was grossly incompetent or inadequate medical care. *See Allard*, 779 F.3d at 772-73. In sum, no reasonable juror could find when viewing the evidence in the light most favorable to Carter that Dr. Craane's management of Carter's pain medication constituted deliberate indifference. Accordingly, the Court recommends that the Motion be granted as to Dr. Craane.

**B.    The Court Recommends that Rysh and Haugland be Granted Summary Judgment**

Carter's claims against Rysh and Haugland fare no better. The records show that multiple physical therapists worked with Carter throughout his recuperation and rehabilitation period. Sometimes Carter complied with the suggested exercises and activities, and other times providers opined that he did not. Specifically, as to Rysh, Carter alleges that she gave him exercises and a leg machine and told him he would have to do things on his own. (Dkt. No. 81 at 5.) Carter alleges that he expressed a need for help, but that she ignored him. (*Id.*) The evidence tells a different story. Rysh indicates that she was proactive about getting a machine to help Carter progress more quickly, and

20

that she gave him a set of home exercises because Carter expressed a desire to advance through therapy quickly. (Dkt. No. 102 at 100-01.) She and other therapists spent hands-on time assisting him by having him demonstrate exercises to them and walking him through exercises. (*Id.* at 97-99.) Rysh noted on August 25, 2016, that Carter was not doing his assigned exercises on a regular basis even though they were posted in his room and written down. (*Id.* at 97.) She concluded that he really needed to do the home exercises to improve strength. (Dkt. No. 102 at 97.) Carter provides no evidence or information to refute the veracity of Rysh's PT notes. Her notes reflect that she gave him reasonable care, or at minimum, that she did not intentionally inflict pain or suffering. *See Allard*, 779 F.3d at 772-73. There is also no indication in the medical records that Rysh chose a course of treatment simply because it was easier to perform. *See id.* She proactively got a machine for Carter's knee, taught him how to use it, and accompanied him about the facility encouraging him to perform exercises. Carter desired much more intensive physical therapy—as much as 100 hours per week—but he was not entitled to such extensive care, and there is no indication it was medically necessary. *See Phillips*, 437 F.3d at 795 ("The fact that Mr. Phillips disagreed with Dr. Freitas as to the proper anti-seizure drug and the need for a blood test does not establish deliberate indifference.") To the extent Carter did not progress as quickly as he would have liked, any such lack of progression does not render Rysh's efforts deliberately indifferent where Carter's refusal to perform his home exercises impeded his improvement. *See Logan*, 119 F.3d at 650. Accordingly, when taking the available evidence in the light most favorable to Carter, no reasonable juror could find that Rysh's actions constituted deliberate indifference.

21

Finally, as to Haugland, the evidence also reflects that he provided Carter with appropriate care.  Carter appears to have disagreed with the course of treatment at times, but there is no indication that Haugland purposefully forced him to suffer rather than provide needed care.  In fact, Haugland's notes indicate that one of the only explanations for Carter's lack of progress was that he was not performing the supplemental home exercises to speed his progress and increase quadricep strength.  (Dkt. No. 102 at 95.) Haugland's efforts, which were impeded by Carter's refusal to perform his prescribed home exercises, cannot be said to have been deliberately indifferent.  *See Logan*, 119 F.3d at 650.  Haugland also noted that Carter would selectively perform exercises or range of motion while in therapy because he would refuse an ability to do something, and then be observed doing said motion later in therapy without prompting.  (Dkt. No. 102 at 95.)  When Carter expressed significant dissatisfaction with Haugland at MCF-Rush City, Carter was then seen by DeHaan, another therapist at the facility.  (*Id.* at 94-95.) DeHaan's notes reflect a strong desire to help Carter and indicate that if Carter wants to make progress, "he needs to choose to fully follow through with the program and push himself more aggressively."  (*Id.* at 94.)  Carter has not shown that there is a general issue of material fact as to the standard of care, the efficaciousness, or the accessibility of the medical care Haugland provided.

**C.    The Court Recommends that Rueckert be Dismissed from this Suit**

Additionally, the Court finds it appropriate to note that it previously provided Carter with the opportunity to amend his complaint to present an individual capacity claim against Rueckert (Dkt. Nos. 70, 72, 73), failing which, she would be permanently

dismissed.  The Court hereby recommends that she be dismissed from this suit because the Third Amended Complaint does not make specific allegations that pertain to her conduct.  (*See* Dkt. No. 81.)  Carter simply left it "up to the Court" to decide if there were claims against her, noting that he thought it would be fair to sue her.  (*Id.* at 8-9.)  The extent of the factual allegation against Rueckert is that she was present at the prison on the day he fell and broke his femur.  There is no allegation that Rueckert acted or failed to act, or that she otherwise purposefully impeded appropriate medical care.  These bare allegations and Carter's deference to the Court are not enough to state a claim against Rueckert, so it is recommended that she be dismissed without prejudice from this action.[7] *See Beck v. LaFleur*, 257 F.3d 764, 766 (8th Cir. 2001) (to state an actionable civil rights claim, a complaint must describe what, specifically, each named defendant did, or failed to do, that allegedly violated the claimant's constitutional rights); *Ellis v. Norris*, 179 F.3d 1078, 1079 (8th Cir. 1999) (civil rights claimants must plead facts showing the defendant's personal involvement in alleged constitutional wrongdoing).

**D.    The Court Recommends that Carter's Motion Be Denied**

As to Carter's motion (Dkt. No. 96) that requests evaluation by an outside medical expert and for an order to keep medication on him, the Court finds this motion baseless.

---

[7]    In her answer to the Third Amended Complaint, Rueckert asserts failure to state a claim as an affirmative defense.  (Dkt. No. 89.)  Given the prior orders concerning claims against her in this litigation (Dkt. Nos. 72, 73), and the Court's authority to establish failure to state a claim at any juncture in prisoner litigation, the Court finds it appropriate to recommend dismissal on this basis.  *See* 28 U.S.C. § 1915(e)(2)(B)(ii) ("[T]he court shall dismiss the case at any time if the court determines that . . . the action . . . fails to state a claim on which relief may be granted . . . .").

Plaintiff in his Motion asserts "Plaintiff challenge [sic] the Defendants Minn. Stat. §

145.682 and ask the Court to grant monetary relief to the Plaintiff while he's incarcerated

to ether hire a Guraduan Atlitem exspert to witness my injury with (DOC) have to pay

meaning Minnesota Department of Corrections if the Defendants want a exspert [sic]

opinion grant plaintiff monetary relief so the plaintiff can pay for outside opinion not the

DOC employers of staff/contractors."  (Dkt. No. 96 at 1, 3.)  Section 145.682 requires a

plaintiff asserting a medical malpractice claim under Minnesota law to timely supply

affidavits of expert review under the threat of dismissal if they are not timely filed.

While Defendants asserted the affirmative defense of failure to comply with § 145.682 in

their Answers (Dkt. Nos. 87, 89, 92), the Court finds that Plaintiff's Third Amended

Complaint does not assert a state law claim for medical malpractice and Defendants have

not moved for dismissal under § 145.682, making Plaintiff's request for expert costs for

the purposes of complying with § 145.682 unnecessary.  *See Baxter-Knutson v. Brandt*,

14-cv-3796 ADM/LIB, 2015 WL 4633590, at \*6 (D. Minn. Aug. 3, 2015) ("Claims

under § 1983 are federal law claims, not subject to state statutes such as Minn. Stat. §

145.682 unless directed by federal law.  There is no federal law directing Baxter–

Knutson to comply with the terms of Minn. Stat. § 145.682 when bringing a § 1983

claim.")

       Additionally, Carter has not filed a motion pursuant to Federal Rule of Civil

Procedure 56(d) explaining why he needed further discovery to respond to summary

judgment.  A Rule 56(d) motion must also be accompanied by a specific affidavit

showing what specific facts further discovery might yield.  Absent such a motion, the

Court is not required to provide time or assistance with additional discovery. *See Stanback v. Best Diversified Prods., Inc.,* 180 F.3d 903, 911 (8th Cir. 1999) (discussing Rule 56(f)—which has now been re-lettered to 56(d)).

Regarding Carter's request for an order stating that he can keep medication on his person to avoid having to walk to get the medication, the Court recommends denial. The Court will construe this request as a request for temporary injunctive relief. *See Parreant v. Schotzko*, No. 00-cv-2014 (JRT/JGL), 2001 WL 1640137, at *7 (D. Minn. Sept. 30, 2001) (construing plaintiff's request to alter his pain medication program as a request for temporary injunctive relief). In determining whether to grant temporary injunctive relief, the Court must consider whether: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C.L. Sys., Inc.,* 640 F.2d 109, 114 (8th Cir. 1981). No single factor is determinative, but "the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied." *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013) (quoting *CDI Energy Srvs., Inc. v. West River Pumps, Inc.,* 567 F.3d 398, 402 (8th Cir. 2009)). The moving party bears the burden of proof on the four factors. *Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir. 1987).

Here, the balance of factors weighs in favor of denying the request for preliminary injunctive relief. First, Carter does not allege facts that support an irreparable harm if he cannot keep medication on his person. Instead, he states that "Plaintiff ha[s] to walk a

distance to get medication[, w]hich [bothers] his leg to keep walking back and fo[]rth, for/with n[e]rve damage pain medication Plaintiff needs." (Dkt. No. 96 at 3.) He does not allege that this additional walking causes him irreparable harm. Second, the balance of harms appears to be neutral. The Court can only speculate as to the harm on Defendants in permitting Carter to keep medication on his person, but perhaps it could lead to illicit or improper use of the medications within a correctional facility. But because the DOC did not respond to this request, the Court will consider this factor neutral. Third, as discussed throughout this Report and Recommendation, Carter's likelihood of success is extremely low, and indeed the DOC has already been dismissed from this action (Dkt. No. 72). Fourth, Plaintiff has not identified any public interest in his having medication on his person. Upon examining these factors in light of the evidence, the Court concludes that Carter has not met his burden, and recommends that his request be denied.

## IV.    <u>RECOMMENDATION</u>

Based on the files, records, and proceedings herein, **THE COURT RECOMMENDS THAT:**

1. The Medical Defendants' Motion for Summary Judgment (Dkt. No. 98) be **GRANTED**.

2. Defendants Jan Rysh, Darin Haugland, and Dr. Craane be **DISMISSED WITH PREJUDICE** from this action.

3. Defendant Katie Rueckert be **DISMISSED WITHOUT PREJUDICE** from this action.

26

4. Carter's Motion to Compel Motion to Dismiss State Remedies Due to § 1983 (Dkt. No. 96) be **DENIED**.

5. Carter's Motion titled "Responded About Defendant Hearing Dates & Request Plaintiff Win Case Due To Not Responding To Court Order Due Date of 11-14-18" (Dkt. No. 126) be **DENIED WITHOUT PREJUDICE**.


DATED: April 25, 2019              _s/Elizabeth Cowan Wright_
                                   ELIZABETH COWAN WRIGHT
                                   United States Magistrate Judge


## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).