# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Ernest Carter, | Case No. 17-CV-1061 (DWF/ECW) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Timothy Hiesterman, | |
| Defendant. | |

This case is before the Court on a Motion for Summary Judgment (Dkt. 131) ("Motion") brought by Defendant Timothy Hiesterman ("Dr. Hiesterman"). The case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. Plaintiff Ernest Carter ("Carter") is a former inmate[1] of the Minnesota Department of Corrections ("DOC") who brings this Section 1983 civil rights action against Dr. Hiesterman for issues related to a fractured femur (Dkt. 81). Dr. Hiesterman seeks summary judgment on the ground that he did not exhibit deliberate indifference towards Carter's medical needs. For the reasons stated below, the Court recommends the Motion be granted.

---

[1]  On June 18, 2019, Carter filed a Notice of Change of Address stating he would be released from prison on July 8, 2019 and providing a new address to the Clerk's Office. (Dkt. 153.) On October 11, 2019, Carter updated his address again. (Dkt. 159.) In the same document, he stated that Ernest Carter is an alias and Henry Shepard is his real name. (*Id.*) Because the medical records referred to herein refer to Ernest Carter (*see, e.g.*, Dkts. 102, 135), the Court will continue to refer to Plaintiff as Ernest Carter.

## I.   BACKGROUND

A detailed procedural history of this case and a thorough recitation of the facts can be found in this Court's April 25, 2019 Report and Recommendation, which recommended dismissal of all claims except those asserted against Dr. Hiesterman.[2] (Dkt. 140.)  That Report and Recommendation was adopted by U.S. District Judge Donovan W. Frank on May 15, 2019, and Jan Rysh, Darin Haugland, Dr. Stephen Craane, and Katie Rueckert were dismissed from this action, leaving only Dr. Hiesterman as a defendant.[3] (*See* Dkt. 144.)  Here, the Court will recite only those facts necessary to resolve Dr. Hiesterman's Motion.

### A.   Procedural History

Carter's Amended Complaint and Second Amended Complaint were compiled into a single operative Third Amended Complaint. (*See* Dkts. 7, 78, 80, 81; *see also* Dkt. 140 at 2-5 (describing procedural history).)  In his original Complaint, Carter alleged that on June 21, 2016, 5:30 p.m., he fractured his femur during an incident at the Minnesota Correctional Facility ("MCF")-St. Cloud. (Dkt. 1 at 7.)  He stated that he tripped, hit his head on a railing, and immediately experienced excruciating pain in his right leg. (*Id.* at 7-8.)  He underwent surgery at St. Cloud Hospital and spent a few days recovering. (*Id.*)  Thereafter, he was transferred to MCF-Oak Park Heights for initial recovery and physical

---

[2]   The Report and Recommendation noted that Dr. Hiesterman had moved for summary judgment and stated it would be dealt with by a separate report and recommendation after briefing was complete. (Dkt. 140 at 15.)

[3]   The Court had previously dismissed Carter's claims against the DOC and any official capacity claim against Rueckert. (Dkt. 72.)

therapy. (*Id.*) Carter sought relief based on alleged violations of the Eighth Amendment. (*Id.* at 5.)

In his Third Amended Complaint, Carter alleges that "no staff hurt[] my leg or inju[]ed me, they just violated my rights." (Dkt. 81 at 3.) He alleges that he was unconscious for about eight to nine minutes after he fell and that he was lying on the floor screaming in pain for about 45 minutes to an hour, without assistance. (*Id.* at 6.) The crux of Carter's claims, however, relate to post-surgical claims that he was taken off his pain medication and was provided with insufficient or inadequate physical therapy. (*See id.* at 5-7, 10.) Specifically, Carter alleged that Dr. Craane took him off pain medications. (Dkt. No. 81 at 5.) He also alleges that Brian Lee, a PA at St. Cloud Orthopedic Associates, gave him a prescription, but it was ripped up upon return to MCF-Oak Park. (*Id.* at 5-6; *see* Dkt. 135 at 8-9 (PA Lee's medical notes).) Carter alleges that he was in constant pain, but only received Ibuprofen after the prescription was torn up. (*Id.* at 6.) With respect to Dr. Hiesterman, the only allegation is that he "was there, the day [Carter] injur[]ed [him]self." (Dkt No. 81 at 6.)

**B.   Medical History**

Dr. Hiesterman's records indicate that he was the surgeon who operated on Carter. (Dkt. 135 at 4-5.) Carter was admitted to St. Cloud Hospital on June 21, 2016, with a laceration to the right side of his forehead, tenderness in his shoulder, and a right midshaft femur fracture. (*Id.* at 1-2.) Carter agreed to undergo an open reduction/internal fixation of his right femur based on Dr. Hiesterman's recommendation. (*Id.* at 2.) The surgery report indicates that the procedure to repair the femur went as

3

planned, and that Carter was to be non-weight bearing for six weeks, with a follow-up visit in two weeks. (*Id.* at 5.)

On July 8, 2016, Carter underwent a follow-up exam at St. Cloud Orthopedic Associates. (*Id.* at 6.) It appears that Carter was seen by PA Lee under the direction of Dr. Hiesterman.[4] (*See id.* at 7.) Healing of the surgical site was positive, and x-rays showed that the surgical hardware was intact. (*Id.*) However, PA Lee noted concern with the range of motion of the right knee. (*Id.* at 6-7.) He prescribed Percocet "for breakthrough pain, especially now that [Carter] is going to begin more rigorous campaign of range of motion." (*Id*. at 7.). He reminded Carter to remain non-weightbearing. (*Id.*)

From June 24 to September 6, 2016, Carter was seen by Dr. Craane 13 times at MCF-Oak Park. (Dkt. 102 at 46-51.) On July 21, 2016, Carter's pain medication was swapped for another at his own request. (*Id.* at 49.) By July 27, Carter reported improved range of motion and no negative complications. (*Id.*) On August 10, Carter agreed to begin weaning off pain medications during an appointment with Dr. Craane. (*Id.* at 48.)

PA Lee saw Carter for a second follow-up on August 19, 2016. (Dkt. 135 at 8-9.) The x-rays showed that the surgical hardware was still intact, and the bone was re-growing. (*Id.* at 8.) Carter reported difficulty managing his pain. (*Id.*) PA Lee cleared

---

[4]  Dr. Hiesterman characterized the July 8, 2016; August 19, 2016; and September 28, 2016 medical notes as his notes. (Dkt. 133 at 5-6.) It appears that PA Lee may have examined Carter and that Dr. Hiesterman signed the notes with PA Lee. (Dkt. 135 at 6-12.) Since Dr. Hiesterman relies on the medical notes in connection with his Motion, the Court has considered them when evaluating Dr. Hiesterman's conduct.

4

Carter to begin weightbearing. (*Id.* at 9.) He recommended that Carter use ice and elevate his leg to decrease pain and swelling. (*Id.*) PA Lee's notes also stated:

> As this patient would begin to increase weightbearing, I did provide this patient with a prescription for Percocet. We discussed the appropriate and judicious use of opioids and NSAIDs, from which the patient was able to reiterate. This patient is incarcerated, however, and his opioid intake should be controlled. Of interesting note, I did receive a phone call from the correctional facility physician stating that this patient has receive[d] copious amounts of opioid analgesics over the last month or so. This was not brought to my attention by [Carter]. The patient did state to me that his pain has not been attenuated. I did ask physician to please take my prescription and shred it so it cannot be utilized. It is in lieu of my conversation, this office will not be providing opioid analgesic medication of any form to [Carter] at this time.

(*Id.* at 9.) Carter was scheduled for a follow-up in approximately six weeks. (*Id.*)

Dr. Craane's notes indicate that PA Lee originally prescribed 40 tablets of Norco for Carter at the August 19, 2016 appointment, but that upon seeing PA Lee's prescription, he contacted PA Lee, discussed that Carter had already ingested a large quantity of narcotics, and the two agreed to shred the prescription. (Dkt. 102 at 48.) PA Lee's notes indicate that he discussed pain management with Carter and with Dr. Craane, and concluded that further narcotics would be inappropriate because Carter had received "copious amounts of opioid analgesics over the last month or so," which Carter had not brought to PA Lee's attention. (Dkt. 135 at 8-9.)

On August 22, 2016, Dr. Craane switched the over-the-counter medications from Tylenol and naproxen to Tylenol and Lodine to improve pain management for Carter. (Dkt. 102 at 47.) On August 30, Dr. Craane did not record any new pain management complaints. (*Id.*) On September 2, 2016, Dr. Craane approved Carter for discharge from MCF-Oak Park Heights with the recommendation that he continue physical therapy

5

("PT") and attend a follow-up appointment with his surgeon, Dr. Hiesterman. (*Id.* at 46.) Upon discharge, Dr. Craane noted that Carter ingested a total of 290 narcotic pain pills between June 24, 2016 and August 10, 2016. (*Id.*) He also noted that Carter was ambulating with the assistance of a single point cane and that PT had cleared Carter to return to the general population. (*Id.*)

On September 28, 2016, PA Lee discussed the use of opioids with Carter and informed him that St. Cloud Orthopedic Associates would not supply further opioids. (Dkt. 135 at 11.) "The patient is going to have to rely on physical therapy and over-the-counter NSAIDs from which he says did not work at this time. The patient has not once made our clinic aware that he was also receiving opioid analgesics from the correctional facility as well." (*Id.*) Carter was also instructed to use ice and elevate his leg to reduce pain and swelling. (*Id.*) The visit notes indicated that the surgical site was healing well. (*Id.* at 10-11.) However, "[t]he patient's range of motion here in clinic today was slightly questionable. The patient was acting out in pain. He had -5 to -10 degrees from full symmetric extension." (*Id.* at 10.) PA Lee recommended that Carter continue with physical therapy for range of motion and strengthening and that he continue weightbearing as tolerated. (*Id.*) A follow-up was recommended in three months. (*Id.*)

At his six-month post-operative appointment on December 22, 2016 with Dr. Hiesterman, Carter reported problems managing his pain. (*Id.* at 13.) Dr. Hiesterman assured him that the bone was fully healed, and he could participate in any and all activity as tolerated. (*Id.*) He observed discomfort in the knee and ankle at the extremes of motion but did not note any "grinding or crepitation." (*Id.*) Carter inquired about

6

traditional pain medicines or medications, and Dr. Hiesterman declined to offer them, instead indicating that Carter should continue with physical therapy. (*Id.*) Carter stated he had some limited access to physical therapy and was requesting more therapy, and Dr. Hiesterman told him that his activities included being an active participant in the home exercise program the therapist had showed Carter. (*Id.*) Follow-ups were to be scheduled on an as-needed basis. (*Id.*)

**C.    Parties' Briefing**

On March 29, 2019, Dr. Hiesterman moved for summary judgment. (Dkt. 131.) Dr. Hiesterman argued that the care he provided during surgery and at four subsequent follow-up visits did not amount to deliberate indifference because the fracture site healed appropriately, and Carter received pain management care at the prison facility. (Dkt. 132.) On April 9, 2019, the Court issued a briefing order setting the deadline for Carter's response of May 7, 2019. (Dkt. 139.)

On April 30, 2019, the Clerk's Office received a letter from Carter requesting an extension of time for his response beyond the May 7, 2019 deadline. (Dkt. 142.) Carter did not explain why he needed more time or state how much time he needed, but asked that the Clerk's Office send him copies of materials he had filed with the Court. (*Id.*) The Court gave Carter an additional 14 days (until May 21, 2019) for his response, and explained that any requests for further extensions must be supported by specific reasons why additional time was needed. (Dkt. 143.) The Court also directed Carter to seek copies from the Clerk's Office. (*Id.*)

7

Carter never filed an opposition to Dr. Hiesterman's Motion. Dr. Hiesterman filed a reply on June 4, 2019, wherein he contends that his Motion should be granted because Plaintiff failed to demonstrate a genuine dispute of material fact. (Dkt. 149 at 2.) He also contends that dismissal is appropriate because Carter has failed to prosecute this action. (*Id.*)

## II.  LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party has the initial responsibility of demonstrating that there is no genuine issue of material fact to be decided. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In its review of the facts the court must consider the evidence in the light most favorable to the party opposing summary judgment. *Kneibert v. Thomson Newspapers, Michigan, Inc.*, 129 F.3d 444, 451 (8th Cir. 1997). When a motion for summary judgment has been made and supported by the pleadings and affidavits as provided in Rule 56(c), the burden shifts to the party opposing the motion to proffer evidence demonstrating that a trial is required because a disputed issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In satisfying this burden, however, the non-moving party must do more than simply establish doubt as to the material facts. The party opposing summary judgment may not "rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 587 & n.11; *see also Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995); Fed. R. Civ. P. 56(e). "Where the record taken as a whole

8

could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

A failure to respond to a motion for summary judgment does not compel an automatic grant of summary judgment in favor of the movant. *See e.g. United States v. One Parcel of Real Prop.,* 27 F.3d 327, 329 n. 1 (8th Cir. 1994) (failure to respond to summary judgment does not automatically compel resolution in favor of moving party). Rather, Rule 56(e) provides that, if a party fails to respond or address another party's assertion, the court shall grant summary judgment only if the motion and supporting materials warrant that outcome. Fed. R. Civ. P. 56(e)(3).

In order to state a cognizable Eighth Amendment claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Davis v. Hall*, 992 F.2d 151, 152 (8th Cir. 1993). In the context of a claim of inadequate medical care, the prisoner must demonstrate more than medical negligence. *Givens v. Jones*, 900 F.2d 1229, 1232 (8th Cir. 1990). The "deliberate indifference to a serious medical need must rise to the level of an unnecessary and wanton infliction of pain." *Jorden v. Farrier*, 788 F.2d 1347, 1348 (8th Cir. 1986). A serious medical need is a need that has been diagnosed as requiring treatment or is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995). Failure to treat a medical condition is not punishment under the Eighth Amendment unless prison officials knew that the condition created excessive risk to the

prisoner's health and then failed to act on that knowledge. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (*citing Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996)).

A delay in treatment or a denial of medication can constitute deliberate indifference under some circumstances. However, if a course of treatment is changed or altered based on "medical judgment" or because of an inmate's uncooperative behavior, then deliberate indifference does not exist. *See Jenkins v. Cty. of Hennepin, Minn.,* 557 F.3d 628, 632 (8th Cir. 2009) (nurse's decision to briefly postpone an X-ray reflects a medical judgment and did not give rise to a deliberate indifference claim) (affirming summary judgment); *Logan v. Clarke,* 119 F.3d 647, 650 (8th Cir. 1997) (finding doctors not deliberately indifferent where prisoner was unable to or refused to follow instructions) (affirming summary judgment). The fact that an inmate disagrees with the prescription of one medication or another to treat a medical condition does not make the administration of the prescription or lack thereof deliberate indifference. *See Phillips v. Jasper County Jail,* 437 F.3d 791, 795 (8th Cir. 2006) (affirming summary judgment that a prison doctor was not deliberately indifferent for selecting one seizure medication or dosage over another despite inmate's opposing views). An inmate's mere disagreement with a course of treatment does not constitute deliberate indifference. *Allard v. Baldwin,* 779 F.3d 768, 772 (8th Cir. 2015). "A plaintiff can show deliberate indifference in the level of care provided in different ways, including showing grossly incompetent care, showing a defendant's decision to take an easier and less efficacious course of treatment, or showing a defendant intentionally delayed or denied access to medical care." *Id.* at 772 (internal citations omitted).

### III.   ANALYSIS

Dr. Hiesterman contends that Carter's claims against him should be dismissed for failure to prosecute because Carter did not file an opposition to the Motion. (Dkt. 149 at 2.) The Federal Rules of Civil Procedure and Local Rules of the District of Minnesota do permit the Court to recommend dismissal. *See* Fed. R. Civ. P. 41(b) (permitting dismissal for plaintiff's failure to prosecute); D. Minn. LR 7.1(g)(6) (permitting court to "take any other action that the court considers appropriate" when a party fails to timely file and serve a memorandum of law). However, in the interests of having this matter decided on its merits, the Court will not recommend dismissal on that ground alone.

Dr. Hiesterman next contends that the Court should grant summary judgment in its entirety since Carter failed to respond to the Motion. (Dkt. 149 at 2.) However, a failure to respond does not compel an automatic grant of summary judgment on this ground. *See e.g.*, *One Parcel of Real Prop.,* 27 F.3d at 329 n.1 (explaining that "failure to respond to . . . motion for summary judgment . . . does not automatically compel resolution of [an] appeal in favor of [the moving party]" and that "a reviewing court must still determine whether . . . entry of summary judgment was appropriate"). Rather, the Court will consider whether summary judgment is appropriate based on the Motion and supporting materials submitted by Dr. Hiesterman. *See* Fed. R. Civ. P. 56(e)(3) (court may "grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it"). For the reasons stated below, based on the medical records submitted by Dr. Hiesterman, and the records

reviewed when addressing other summary judgment motions in this case, the Court recommends that summary judgment be granted in favor of Dr. Hiesterman.

The only mention of Dr. Hiesterman in the Third Amended Complaint is that he "was there, the day [Carter] injur[]ed [him]self." (Dkt No. 81 at 6.) It is not clear whether Carter is (1) alleging that Dr. Hiesterman was present at MCF-St. Cloud when Carter fell on June 21, 2016, or (2) is referring to the fact that Dr. Hiesterman examined him on the same day at St. Cloud Hospital (*see* Dkt. 135 at 1-2). If it is the first, there is no evidence of record supporting an allegation that Dr. Hiesterman was at MCF-St. Cloud when Carter fell, much less that Dr. Hiesterman knew about Carter's fall and injury yet somehow failed to respond.

If it is the second, nothing in the record suggests that Dr. Hiesterman's pre-surgery consultation with Carter on June 21, 2016 constituted deliberate indifference to Carter's medical needs. Rather, the medical notes indicate that Dr. Hiesterman examined Carter, understood what caused the injury, reviewed the X-rays and noted a "comminuted displaced right midshaft femur fracture," reviewed treatment options (including surgery) with Carter, confirmed that Carter understood the options, and obtained Carter's consent to the surgery. (Dkt. 135 at 1-2.) As to the surgery itself, which took place the next day, Dr. Hiesterman's medical notes indicate that the surgery went well with no complications, and the patient was transferred out of the operative suite in stable condition. (*Id.* at 4-5.) No evidence indicates that Dr. Hiesterman engaged in any acts or made any omissions sufficiently harmful to constitute deliberate indifference to Carter's serious medical needs, *see Estelle*, 429 U.S. at 105, or that he was so indifferent to

12

Carter's serious medical needs that his conduct rose to the level of an unnecessary and wanton infliction of pain," *Jorden*, 788 F.2d at 1348.

As to Carter's follow-up appointments with PA Lee and Dr. Hiesterman, the medical notes clearly show that the surgical site healed well. (Dkt. 135 at 6-14.) Based on the record, the only aspect of Dr. Hiesterman's care that Carter did not agree with was PA Lee's and Dr. Hiesterman's refusal to prescribe narcotics for him after they learned that he had "receive[d] copious amounts of opioid analgesics over the last month or so." (Dkt. 135 at 8-11.) Carter disliked this decision, but St. Cloud Orthopedic Associates records and the prison medical records demonstrate that it was a collaborative medical decision to taper off narcotics in view of the quantity Carter had consumed as of that date. (*Id.* at 8-9; Dkt No. 102 at 48.) In fact, as of August 10, 2019, Carter had agreed with Dr. Craane to begin weaning himself off narcotics. (Dkt. 102 at 48.) There is no evidence in the record that Dr. Hiesterman (or that PA Lee, acting under Dr. Hiesterman's supervision), knew that Carter still required narcotics for pain management and disregarded that need. *See Phillips,* 437 F.3d at 795 ("Deliberate indifference requires a showing that the medical provider knew of and disregarded a serious medical need."). Rather, the medical records indicate that as of August 18, 2016, Carter's leg was healing well, he was in no acute distress, and he had "excellent pain-free range of motion." (Dkt. 135 at 8.) On the same day, PA Lee recommended that Carter could begin weightbearing as tolerated, and as of September 28, 2016, Carter was deemed ready to participate in physical therapy. (*Id.* at 9-11.) The fact that Carter disagreed with Dr. Hiesterman's decision to cease prescribing him narcotics does not mean Dr.

13

Hiesterman's decision to do so constitutes deliberate indifference. *See Phillips,* 437 F.3d at 795; *Allard*, 779 F.3d at 772. Further, Carter continued to receive medical care from St. Cloud Orthopedic Associates and the prison after he was no longer prescribed narcotics. (*See, e.g.*, Dkt. 102 at 45-47; Dkt. 135 at 10-14.) In the absence of any evidence showing Dr. Hiesterman provided grossly incompetent care, decided to take an easier and less efficacious course of treatment, or deliberately denied Carter access to medical care, there is no genuine issue of material fact for the jury to consider. *See Allard*, 779 F.3d at 772. Accordingly, the Court recommends that Dr. Hiesterman's Motion be granted.

## IV.     RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS RECOMMENDED THAT:**

1. Dr. Hiesterman's Motion for Summary Judgment (Dkt. 131) be **GRANTED.**

2. Defendant Dr. Hiesterman be **DISMISSED WITH PREJUDICE** from this action.

Dated: October 21, 2019            *s/Elizabeth Cowan Wright*
                                   ELIZABETH COWAN WRIGHT
                                   United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).